## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| VERTIV CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>VALTRUS INNOVATIONS LTD. and KEY PATENT INNOVATIONS LTD.,<br><br>Defendant, | Civil Action No. 2:26-cv-00084<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Vertiv Corporation, ("Vertiv"), for its Complaint against Defendants, Valtrus Innovations Limited ("Valtrus Innovations") and Key Patent Innovations Limited ("KPI") (collectively, "Valtrus"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the patent laws of the United States, including Title 35, United States Code. Vertiv seeks declarations that United States Patent Nos. 6,854,284 (the "'284 Patent"); 6,868,682 (the "'682 Patent"); and 6,868,683 (the "'683 Patent") (collectively, "the Patents-in-Suit") are invalid, and that Vertiv's products do not infringe.

2.      This action arises from Valtrus' ongoing campaign to interfere with Vertiv's relationship with its valued customers by aggressively and serially threatening and pursuing unfounded and false claims of patent infringement of the Patents-in-Suit in letters and lawsuits based on those customers' use of Vertiv data center cooling and control products. Valtrus' explicit

reliance on the features and capabilities of Vertiv's products in its infringement allegations establish an Article III case or controversy between Vertiv and Valtrus.

3.      Vertiv and Valtrus are no strangers in litigation.  As set forth below, Valtrus has sued several Vertiv customers, and threatened to sue several others, for alleged infringement of patents Valtrus acquired from Hewlett Packard Enterprises ("HPE").  The Patents-in-Suit are among those patents Valtrus has used to threaten and/or sue Vertiv's customers based on features and capabilities of Vertiv's products that are alleged to infringe.  Vertiv intervened in certain lawsuits brought against Vertiv's customers to protect its business interests, to assist the customers in defense of Valtrus' unfounded assertions, and in furtherance of contractual indemnity obligations to the customers.  Valtrus settled those cases prior to any decisions on the merits related to non-infringement and invalidity issues and has engaged in a pattern of serially filing and settling those and other cases brought against Vertiv customers before resolution on the merits.

4.      Vertiv also has an ongoing declaratory judgment action in this Court in which it seeks a declaration of non-infringement and invalidity of U.S. Patent No. 6,854,287.  *Vertiv Corp. v. Valtrus Innovations Ltd.*, No. 2:24-cv-00907-JRG-RSP (the "'287 Patent DJ Action").  Valtrus asserts that the '287 Patent is infringed by the cooling methods performed by the accused Vertiv equipment in normal modes of operation.

5.      Vertiv's products do not infringe the Patents-in-Suit because the products lack the capabilities claimed in the Patents-in-Suit and the methods performed by those products do not practice the methods claimed in the Patents-in-Suit. Valtrus' infringement assertions based on the use of Vertiv's products in customers' facilities are therefore baseless and unjustified.

6.      Vertiv seeks relief resolving the controversy between Valtrus and Vertiv, to protect its relationships with customers alleged to infringe based on their use of Vertiv products and to

remove the uncertainty and false accusations of patent infringement based on the use of features inherent in and methods performed by Vertiv's products.

## PARTIES AND BACKGROUND

7.      Vertiv is an American multi-national publicly traded corporation that is incorporated in Delaware and has its principal place of business at 505 N. Cleveland Ave., Westerville, OH 43082 in Franklin County.  Vertiv is a provider of critical infrastructure and services for data centers and other computing facilities.

8.      Intellectual property is important to Vertiv.  Vertiv continually invests in research and development and has received hundreds of U.S. patents and thousands of patents globally for its innovations.

9.      Vertiv also values its relationships with its customers.  Part of Vertiv's success is attributable to standing behind its products and services.  One way that Vertiv stands by its products is through indemnity agreements.

10.      Upon information and belief, Valtrus Innovations is an Irish entity duly organized and existing under the laws of the Republic of Ireland.  The address of the registered office of Valtrus is: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

11.      Upon information and belief, KPI is the beneficiary of a trust pursuant to which Valtrus Innovations owns, holds, and asserts the Patents-in-Suit.  KPI is an Irish entity duly organized and existing under the laws of Ireland. The address of the registered office of KPI is: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

12.      Upon information and belief, neither Valtrus Innovations nor KPI have any employees who live or work within the United States of America.

13.     On information and belief, Valtrus Innovations' business purpose is as "the owner of an extensive portfolio of patents originating from Hewlett Packard Enterprise Company [HPE]. Valtrus' portfolio covers a range of products and technologies including servers, cloud and data centre management, memory, processors, WLAN, network analytics, power and many more related technologies.  The portfolio includes patents whose use are ubiquitous in these areas. Valtrus is focused on licensing these patents to established players and new entrants in the applicable market."  *See* www.valtrusinnovations.ie.

14.     Upon information and belief, Valtrus does not make, use, or offer for sale any products in the United States.

15.     Upon information and belief, Valtrus' activities in the United States relate only to the enforcement and licensing of its patent portfolio.

16.     Upon information and belief, none of the named inventors on the Patents-in-Suit is currently or ever has been a Valtrus employee.

17.     As part of its enforcement efforts, Valtrus filed lawsuits in 2024 and 2025 in this District alleging patent infringement against the following customers of Vertiv:

- Digital Realty Trust, Inc. and Digital Realty Trust, L.P. (collectively, "Digital Realty"), 2:24-cv-00139-JRG;

- Dawn Acquisitions LLC (d/b/a Evoque Data Center Solutions, "Evoque"), 2:24-cv-00142-JRG;

- CyrusOne, LLC, 2:24-cv-00259-JRG ("CyrusOne");

- NTT Data Services, LLC et al., 2:24-cv-00361-JRG;

- TierPoint, LLC ("TierPoint"), 2:24-cv-00776-JRG;

- DataBank Holdings Ltd. ("DataBank"), 2:24-cv-00777-JRG; and

- Equinix, Inc. ("Equinix"), 2:25-cv-000016-JRG.

18.    In each of the TierPoint, DataBank and Equinix cases, Valtrus asserted infringement of the Patents-in-Suit (and additional patents) based on the methods performed by Vertiv's products in the customer's facilities.

19.    For each of the above actions, Valtrus procured settlement with the respective defendant prior to resolution of any of Valtrus' allegations on the merits.

20.    Valtrus also asserted one of the Patents-in-Suit, the '682 Patent, in a counterclaim filed against Vertiv and numerous Vertiv customers in the '287 Patent DJ Action. *Valtrus Innovations Ltd. v. NTT Data Services, LLC et al.*, 2:24-cv-00361-JRG, Dkt. 151 ¶¶ 152–56 (E.D. Tex. May 14, 2024).  Valtrus alleged that Vertiv's customers infringed the '682 Patent based on their use of Vertiv products and that Vertiv is liable for its customers' infringement.

21.    In connection with its counterclaim, Valtrus included an "exemplary claim chart demonstrating one manner in which Vertiv Customers infringed claim 1 of the '682 Patent" using inherent features of Vertiv products.  Dkt. 151 ¶ 155 (referencing Ex. 8).

22.    The Court struck Valtrus' counterclaims, including the counterclaim directed to the '682 Patent, and the infringement assertions against Vertiv products made therein remain unresolved.

23.    Additionally, around March 2024, Valtrus' litigation counsel sent letters on behalf of Valtrus to at least ten data center operators accusing those companies of infringing other Valtrus patents based on their use of Vertiv cooling equipment.  The letters also identified the Patents-in-Suit and characterized them as being directed to important cooling system technologies implemented in data centers, thereby implying that the data center operators faced risk of infringement allegations based on these patents.

24.     In January 2025, Valtrus' litigation counsel sent letters on behalf of Valtrus to at least ten additional data center operators accusing those companies of infringing one or more of the Patents-In-Suit, among others, based on their use of Vertiv products and enclosing claim charts for the Patents-In-Suit. The claim charts attached to Valtrus' counsel's letters purport to show infringement of the Patents-in-Suit based on features and operations of Vertiv's products as described in Vertiv's product literature.  The letters implicitly threaten litigation by referencing Valtrus' then-pending actions in this District against other data center operators, setting a deadline for the recipient to agree to meet to discuss a license, and stating that Valtrus "reserves all rights" should the recipient decline such a meeting.

25.     Vertiv's products, however, are incapable of infringing the Patents-in-Suit under any mode of operation. *See infra* at ¶¶ 65–97.

26.     Upon information and belief, Valtrus' patent infringement notice letters also identify and were sent to its licensing agent, Patent Platform Services LLC ("PPS").  PPS has a principal place of business located at 7460 Warren Parkway, Suite 100, Frisco, Texas 75034, and has several employees who reside and work in Texas, including in relation to services provided on behalf of Valtrus.

27.     On information and belief, several of the customers to whom Valtrus sent patent infringement notice letters own or operate data centers within the Eastern District of Texas.

28.     On information and belief, Valtrus' counsel and/or other representatives of Valtrus have initiated other correspondence and communications with Vertiv's customers, including customers having a presence in Texas, in furtherance of Valtrus' attempts to pressure those customers into acquiring a license to Valtrus' patents.

29.    Valtrus sought discovery about the Vertiv products that form the basis of Valtrus' infringement allegations in the cases it filed in the Eastern District of Texas cases against Digital Realty, Evoque, CyrusOne, TierPoint, DataBank, and Equinix.

30.    On information and belief, Valtrus would also seek to procure discovery from Vertiv about its products if it were to file additional lawsuits against any Vertiv customers based on the Vertiv products that form the basis of infringement allegations in the many patent infringement notice letters it has already sent.

31.    As part of protecting its highly valued customer relationships, Vertiv has notified customers that have been threatened or sued that it will comply with its contractual indemnity obligations arising from Valtrus' patent infringement allegations based on the use of Vertiv products.

## JURISDICTION

32.    This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the patent laws of the United States, 35 U.S.C. § 1 et seq.

33.    This court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1132, 1338(a), and/or 1367, 2201, and 2202.

34.    The amount in controversy exceeds $75,000.  All the allegations contained herein form part of the same case or controversy.

35.    Upon information and belief, Valtrus owns all rights, title, and interest in the Patents-in-Suit.

36.    Upon information and belief, Valtrus possesses all rights of recovery for allegations of infringement of the Patents-in-Suit.

37.    Personal jurisdiction over Valtrus is proper because Valtrus has purposefully directed activities or transactions to this forum and has performed acts purposefully availing itself

of the privilege of conducting activities in this forum related to the subject matter of this case. Specifically, Valtrus acquired the patents that it owns from Hewlett Packard Enterprise Development, LP, and Hewlett Packard Enterprise Company, the former being a Texas limited partnership having its principal place of business in Houston, Texas.  After acquiring ownership of the patents, Valtrus sent letters to companies within this forum asserting allegations of patent infringement and offering a license to the Patents-in-Suit and/or seeking a meeting regarding licensing of the Patents-in-Suit.  Valtrus chose a Texas-based licensing agent, PPS, to support and participate in its efforts to extract licensing revenue from Vertiv customers based on their use of Vertiv products.  A substantial part of the events giving rise to the dispute occurred in this District, including when Valtrus contacted, threatened and sued Vertiv's customers who operate data centers located in this District.

38.     Personal jurisdiction is also proper because Valtrus has filed multiple suits for patent infringement in this District and consented to this Court's jurisdiction and convenience as a forum as part of its patent enforcement strategy.

39.     Valtrus has acknowledged that its purposeful activities subject it to the personal jurisdiction of Courts in the State of Texas.  In particular, Valtrus submitted a Declaration of its Managing Director, Angela Quinlan, in connection with the action *SAP America, Inc. v. Valtrus Innovations Ltd. et al*, 24-cv-54-GBW (D. Del. Jan. 15, 2024). *See* Ex. E ("Quinlan Declaration"). The Quinlan Declaration acknowledges, inter alia, the numerous patent infringement lawsuits Valtrus has filed and pursued in the federal courts in Texas and the fact all of Valtrus' patents were acquired from Hewlett Packard Enterprises, which is based in Texas. *See id.* at ¶¶ 6, 12. Valtrus, via the Quinlan Declaration, further acknowledged, agreed and consented that jurisdiction over Valtrus is proper in Texas. *See id.* at ¶ 13.

40.     Valtrus has availed itself of the rights and benefits of the laws of Texas.  It has conducted business relating to the licensing and enforcement of its patents, including the Patents-in-Suit, in Texas, directly and through PPS and/or other agents, and it has systematic and continuous business contacts with Texas through its patent enforcement and licensing activities.

41.     To the extent that Valtrus lacks sufficient contacts with any state, Vertiv alleges in the alternative that personal jurisdiction over Valtrus is also proper under Fed. R. Civ. Pro. 4(k)(2) in this District because this case relates to Valtrus' assertions of patent infringement and therefore arises under federal law; Valtrus Innovations and KPI are each  Irish corporations; and Valtrus has sufficient contacts with the United States as a whole, as it is directing its patent enforcement efforts toward various United States entities.   For example, Valtrus has pursued judicial patent enforcement in Texas by filing suit in at least *Valtrus Innovations Ltd. v. Google LLC*, 3:22-cv-00066 (N.D. Tex. Jan. 10, 2022); *Valtrus Innovations Ltd. v. SAP America, Inc. et al*, 2:24-cv-00021-JRG (E.D. Tex. Jan. 15, 2024); *Valtrus Innovations Ltd. v. AT&T Inc. et al*, 2:23-cv-00443-JRG (E.D. Tex. Sept. 27, 2023); *Valtrus Innovations Ltd. v. Digital Realty Trust, Inc. et al*, 2:24-cv-00139-JRG (E.D. Texas Feb. 27, 2024); *Valtrus Innovations Ltd. v. Dawn Acquisitions LLC (d/b/a Evoque Data Center Solutions)*, 2:24-cv-00142-JRG (E.D. Tex. Feb. 27, 2024); *Valtrus Innovations Ltd. v. T-Mobile USA, Inc. et al*, 2:23-cv-0444-JRG (E.D. Tex. Sept.27, 2023); *Valtrus Innovations Ltd. v. Verizon Communications Inc. et al*, 2:23-cv-0445-JRG (E.D. Tex. Dec. 4, 2023); *Valtrus Innovations Ltd. v. CyrusOne, LLC*, 2:24-cv-00259-JRG (E.D. Tex. April 17, 2024); *Valtrus Innovations Ltd. v. NTT Data Services, LLC et al.*, 2:24-cv-00361-JRG (E.D. Tex. May 14, 2024); *Valtrus Innovations Ltd. v. TierPoint, LLC*, 2:2024-cv-00776-JRG (E.D. Tex Sept. 25, 2024); *Valtrus Innovations Ltd. v. DataBank Holdings Ltd.*, 2:2024-cv-00777-JRG (E.D. Tex Sept.

25, 2024); and *Valtrus Innovations Ltd. v. Equinix, Inc.,* 2:2025-cv-000016-JRG (E.D. Tex Jan. 7, 2025).

## VENUE

42.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the dispute occurred in this District and because Valtrus is subject to personal jurisdiction in this District.  Venue is also proper because Valtrus is a foreign Company and may be sued in any judicial district in the United States in which Valtrus is subject to the Court's personal jurisdiction.  Valtrus' choice of this District for enforcing its patents through the numerous patent litigations directed to use of Vertiv's products, including currently pending patent litigation, shows that this is also a convenient forum for Valtrus.

## THE PATENTS AT ISSUE

43.     The '284 Patent is entitled "Cooling of Data Centers," names Cullen Bash, Chandrakant Patel, Abdlmonem Beitelmal, and Ratnesh Sharma as the inventors and states an issue date of February 15, 2005.  Attached as Exhibit A is a true and correct copy of the '284 Patent.

44.     The '284 Patent is directed to a method and system for cooling racks in a data center.

45.     On information and belief, Valtrus Innovations owns all right, title, and interest in the '284 Patent and KPI is the beneficiary of a trust pursuant to which Valtrus owns the '284 Patent.

46.     The '284 Patent has expired but remains enforceable for past infringement.

47.     The '682 Patent entitled "Agent Based Control Method and System for Energy Management," names Ratnesh Sharma, Chandrakant D. Patel, and Cullen E. Bash as the inventors and states an issue date of March 22, 2005.  Attached as Exhibit B is a true and correct copy of the '682 Patent.

48.    The '682 Patent is directed to an apparatus and method for controlling temperature in a data center.

49.    On information and belief, Valtrus Innovations owns all right, title, and interest in the '682 Patent and KPI is the beneficiary of a trust pursuant to which Valtrus owns the '682 Patent.

50.    The '682 Patent has expired but remains enforceable for past infringement.

51.    The '683 Patent is entitled "Cooling of Data Centers," names Cullen Bash, Abdlmonem H. Beitelmal, Chandrakant D. Patel, and Ratnesh Sharma as the inventors and states an issue date of March 22, 2005.  Attached as Exhibit C is a true and correct copy of the '683 Patent.

52.    The '683 Patent is directed to a method and system for the cooling of racks in a data center.

53.    On information and belief, Valtrus Innovations owns all right, title, and interest in the '683 Patent and KPI is the beneficiary of a trust pursuant to which Valtrus owns the '683 Patent.

54.    The '683 Patent has expired but remains enforceable for past infringement.

## EXISTENCE OF AN ACTUAL CONTROVERSY

55.    There is an actual controversy within the jurisdiction of this Court under 28 U.S.C. §§ 2201 and 2202.

56.    On information and belief, Valtrus has sent patent infringement notice letters and claim charts to at least ten Vertiv customers purporting to show how Vertiv's products used to cool the customers' facilities infringe at least one claim of each of the Patents-in-Suit.  The claim charts also implicitly give rise to theories of direct and indirect infringement (jointly and contributorily) against Vertiv.  Valtrus has sent patent infringement notice letters to additional Vertiv customers characterizing the Patents-in-Suit as being directed to important technologies implemented in data

center cooling systems and implying that the customer faces risk of infringement claims under the Patents-in-Suit.

57.    Valtrus has also filed three patent infringement suits alleging that features of and methods performed by Vertiv products infringe at least one claim of each of the Patents-in-Suit. The claim charts in each of those cases also implicitly give rise to potential theories of direct and indirect infringement against Vertiv.

58.    Vertiv values its customer relationships and is often contractually bound to indemnify and defend customers against patent infringement claims related to the use of Vertiv products pursuant to various contracts and sales agreements.

59.    On information and belief, Valtrus has also filed numerous patent infringement lawsuits in the past several years, making clear that filing lawsuits is a major strategy of its only U.S. business, the enforcement of its patents.

60.    Valtrus' assertions of patent infringement against Vertiv's customers based on features of and methods performed by Vertiv's products have created strain and uncertainty in Vertiv's relationships with its customers, have harmed Vertiv's reputation in its industry, and have caused Vertiv to devote significant effort and expense to honor its indemnity obligations to customers.  Vertiv understandably desires to clear this cloud of controversy, avoid additional indemnification claims from customers, and maintain its reputation.

61.    It is not in the substantial interest of justice or an efficient use of judicial resources for Vertiv to be forced to defend itself and its customers from Valtrus' unjustified patent infringement claims serially and concurrently in suits against each customer individually in various forums at the time of Valtrus' choosing.

62.    Based on the foregoing, a justiciable controversy exists between Vertiv and Valtrus as to whether features of and methods performed by Vertiv's products, including its Liebert CW, CWA, DS, DSE, PDX, and PCW cooling units controlled by Liebert iCOM and iCOM-S controls, infringe the Patents-in-Suit, as alleged by Valtrus.

63.    Absent a declaration of non-infringement for the accused Vertiv's products, Valtrus will continue to wrongfully allege that use of Vertiv's products by targeted customers infringes the Patents-in-Suit and will continue to contact and sue customers based on the same unjustified infringement theories faced by previously sued customers.  Valtrus will also continue its practice of settling and dismissing cases without precipitating any resolution of its infringement claims on the merits, thus increasing the cost of defense to Vertiv and its customers, preventing Vertiv from clearing its products from these unjustified claims, and thereby causing Vertiv irreparable injury and damage.

64.    Absent a declaration of invalidity of the Patents-in-Suit, Valtrus will continue to wrongfully allege that the use of Vertiv's products infringe the Patents-in-Suit and will continue to contact and sue customers regarding the Patents-in-Suit based on the same unjustified infringement theories faced by previously sued customers.  Valtrus will also continue its practice of settling and dismissing cases without precipitating any resolution of its infringement claims on the merits, thus increasing the cost of defense to Vertiv and its customers, preventing Vertiv from clearing its products from these unjustified claims, and thereby causing Vertiv irreparable injury and damage.

## VERTIV'S PRODUCTS ARE INCAPABLE OF INFRINGING THE PATENTS-IN-SUIT

65.    As indicated above, the infringement allegations included in Valtrus' notice letters and/or disclosed during the respective litigations explicitly rely on features and methodologies provided and performed by Vertiv products.  Vertiv's products, however, are incapable of infringing the Patents-in-Suit in any mode of operation.

66.    For each independent claim of the Patents-in-Suit that Valtrus has identified as being infringed by features and methods of Vertiv products, those products do not operate in a manner that meets all the respective claim elements.

### The '284 Patent

67.    With respect to the '284 Patent, the patent relates to controllable supply air vents and returns in a cooling system which allow for varying the flow of cooling air through the system. The claims of the '284 patent require varying the amount of cooling fluid based on a sensed pressure reading in the return air plenum of the system.

68.    Figure 1 of the '284 Patent discloses a schematic illustration of a data center containing a cooling system in accordance with the claimed invention:



*FIG. 1*

69.    The return air plenum is the area shown as space 22, above the lowered ceiling, shown at 20.  Ex. A, 3:29–34 ("In a manner similar to the raised floor 14, the lowered ceiling 20 may include a space 22 in which a plurality of wires and communications lines (not shown) may be located.  In addition, the space 22 may function as a plenum to return air to the cooling system 12.").  The "returns" (*i.e.*, vents for returning warm air to the cooling system) are marked 38a–38c.

*Id.*, 4:67–5:4 ("This heated cooling fluid may flow into the lowered ceiling through a plurality of dynamically controllable returns 38a–38c that generally operate to control the velocity, direction, and the volume flow rate of the heated cooling fluid therethrough.").

70.     Valtrus has identified only Claim 10 as an independent claim being infringed by Vertiv products.

71.     Claim 10 provides as follows:

10. A method of cooling a plurality of racks in a data center, said method comprising:

> activating a cooling system and opening a plurality of returns, said plurality of returns being configured to remove cooling fluid from various locations of said data center, said plurality of returns also being in fluid communication with a plenum, wherein cooling fluid is configured to flow through the plurality of returns through the plenum and into the cooling system;

> sensing a pressure of said cooling fluid in the plenum;

> determining whether said sensed pressure is within a predetermined pressure range; and

> varying an intake of said cooling system through the plurality of returns in response to said sensed pressure falling outside of said predetermined pressure range.

*See id.* at Claim 10.

72.     The first step of claim 10 recites "returns" (e.g., 38a–38c) that are in fluid communication with the return plenum (i.e., the plenum in fluid communication with the returns) for cooling fluid to flow into the cooling system, and the second element of the claim requires taking a pressure reading in that plenum, *i.e.*, "sensing a pressure of said cooling fluid in the plenum." Finally, the claim requires varying the intake of cooling fluid through the returns based on the pressure reading.

73.     The iCOM and iCOM-S controllers that control the operation of Vertiv's products, including the CW, CWA, DS, DSE, PDX, and PCW products, do not have the capability to control

any aspect of the operation of the products based on pressure sensed in the return plenum.  Vertiv does not provide any components or capabilities to sense pressure in the return plenum. Vertiv's products do not measure pressure in the space above the ceiling containing the return air vents as required by the claim.

74.    Vertiv's iCOM and iCOM-S control systems do not support any method for adjusting the cooling fluid flow in response to pressure sensed in the return air plenum as required by the claim.

75.    In its accusations of infringement by Vertiv's customers, Valtrus does not identify any aspect of Vertiv's products, or use of the same by any customer, which involves sensing pressure in the return air plenum or varying the intake of cooling fluid through the returns and into the cooling system in response to sensed pressure in the return plenum.

76.    Vertiv's accused products, including the Liebert CW, CWA, DS, DSE, PDX, and PCW cooling units controlled by Liebert iCOM and iCOM-S controls, also do not perform the claim step of "opening a plurality of returns."

77.    A determination that Vertiv products do not perform at least the claim steps of sensing pressure in the return air plenum, varying the intake of cooling fluid based on pressure measured in the return plenum, and opening a plurality of returns does not require any information from Vertiv's customers.

## The '683 Patent

78.    The '683 Patent also generally relates to controlling the amount and flow of cooling air through a cooling system.  The claims of the '683 Patent require varying the amount of cooling fluid based on sensed temperature at the racks of a data center.

79.    Figure 1 of the '683 Patent, similar to that of Figure 1 of the '284, discloses a schematic illustration of a data center containing a cooling system in accordance with the claimed invention:



**FIG. 1**

80.    The '683 Patent discloses that cooling air flows from fan 24 into the space 16 (*e.g.*, supply plenum) as indicated by the arrow 34.  Ex. C, 4:57–62.  The cooling air flows out of the raised floor 14 through dynamically controllable vents 36a-36c that can adjust the velocity and the volume flow rate of the air therethrough.  *Id.*  The cooling air absorbs heat as it flows through the racks 18a-18d, and the heated air then flows into the return plenum 22 through dynamically controllable returns 38a-38c that can adjust the velocity and volume flow rate of the heated air therethrough.  *Id.*, 5:1–6.  A return controller 210 manipulates the returns 38a-38c to adjust the removal of warmed air from the vicinity of the racks 18a-18d as necessary to maintain the temperature of the racks within a predetermined range.  *Id.*, 9:8–18.  A supply air vent controller 228 can adjust the supply air flow through vents 36a–36c, and the disclosed system can thus control the supply of cool air through the floor vents in conjunction with controlling the removal of warm air through the returns.  *Id.*, 9:47–51 and 13:34–50.

81.    In general, the claims require an initial step of varying the removal of cooling fluid from the racks and then a subsequent step of varying the supply of cooling fluid in response to the prior step of varying the removal of such fluid.

82.    Valtrus has identified only Claim 10 as an independent claim being infringed by Vertiv cooling units.

83.    Claim 10 provides as follows:

10. A method of cooling a plurality of racks in a data center, said method comprising:

   activating a cooling system and opening a plurality of returns, said returns being configured to remove cooling fluid from various locations of said data center;

   supplying cooling fluid to various locations of the data center;
   sensing the temperatures of said racks;

   determining whether said sensed temperatures are within a predetermined temperature range;

   varying said removal of said cooling fluid from said racks in response to said sensed temperatures being outside said predetermined temperature range; and

   varying the supply of cooling fluid in response to varying said removal of said cooling fluid.

*See id.* at Claim 10.

84.    With respect to the final two steps of claim 10, the iCOM and iCOM-S controllers that control the operation of Vertiv's products, including the CW, CWA, DS, DSE, PDX, and PCW products, do not have the ability to control-adjustable warm air returns or cool air supply vents or to otherwise vary the removal of cooling fluid and then perform a subsequent step of varying the supply of cooling fluid in response to varying the removal. Vertiv does not supply controllable return vents or controllable supply vents, and its products are not designed to operate in conjunction with any such controllable returns or vents.

85.     Valtrus has alleged that the Vertiv cooling units infringe based on their capability to adjust the speed of fans that draw air through the cooling units. However, such capability does not involve the recited two-step sequence of varying the removal of cooling fluid (*i.e.*, warm air) followed by varying the supply of cooling fluid (*i.e.*, cool air) in response to varying the removal of cooling fluid. Vertiv's products only operate to increase or decrease fan speed based on sensed temperature in accordance with conventional practices; they are incapable of operating in a manner to independently adjust the removal or supply of air, much less adjust one in response to the other, as required by the asserted claim.

86.     In its accusations of infringement by Vertiv's customers, Valtrus does not identify any aspect of Vertiv's products, or use of the same by any customer, which performs the sequence of separately recited "varying" steps of the method of claim 10.

87.     A determination that Vertiv's products do not perform at least the sequence of "varying" steps of claim 10 does not require any information from Vertiv's customers.

88.     Vertiv's accused products, including the CW, CWA, DS, DSE, PDX, and PCW cooling units controlled by iCOM and iCOM-S controls, do not perform the claim limitation of "opening a plurality of returns."  Vertiv's products, including iCOM  or iCOM-S control systems, do not control or otherwise effect the opening of any air returns.

89.     Valtrus' infringement contentions contain no evidence that any Vertiv products performs the step of "opening a plurality of returns."

90.     A determination that Vertiv's products do not perform a step of "opening a plurality of returns," as required by claim 10, does not require any information from Vertiv's customers.

**The '682 Patent**

91.     The '682 Patent generally relates to a method of using multiple "agents" or systems to control the temperature through a data center.  The claims of the '682 Patent require varying the amount of cooling fluid based on sensed temperature at the racks of a data center.

92.     The '682 Patent discloses the use of agents distributed throughout subsystems and cooling systems in a data center that can more efficiently deliver cooling air to the components and the subsystems located in the computer racks.  Ex. B, 4:63–5:2.  Rack agents operate various aspects of a rack, including opening and closing of rack vent tiles that provide cooling air to the rack of components.  *Id*., 13:18–27.  Temperature information collected by a rack agent can be processed directly by rack agent or passed along to other agents in the cooling system.  *Id*.  Row agents operate row vent tiles used for cooling multiple racks within a row.  *Id*., 13:28–42.  Row agents can also operate temperature sensors to gather temperature information.  *Id*.  Row agents can also collect temperature and/or cooling information received from other agents to meet cooling objectives associated with row agents.  *Id*.  Computer room air conditioning ("CRAC") agents operate cooling system equipment, including fans, compressors, and heat exchangers for removing heat from a cooling liquid.  *Id*., 13:43–52.  Generally, CRAC agents receive and consolidate temperature, pressure, and other information sensed by other agents in the cooling system.  *Id*.

93.     The claims generally require a first agent "adjusting a delivery rate for a cooling fluid" based on sensed temperature of a subsystem in a data center.  *See id.* at Claim 1.  The claimed approach requires requesting a second agent to process the temperature data if the first agent cannot maintain the subsystem temperature within a predetermined range unless the second agent "redistributes the cooling fluid being delivered to one or more areas of the data center."  *See id.*

94.     Valtrus has identified only Claim 1 as an independent claim being infringed by Vertiv cooling units.  Claim 1 provides as follows:

1. A method of controlling the temperature in a data center comprising:

receiving sensory data corresponding to a temperature from a subsystem in a data center;

processing the sensory data by a first agent in a hierarchy of agents to determine if the subsystems in the data center is operating within a predetermined temperature range;

adjusting a delivery rate for a cooling fluid using the first agent to keep the temperature range of the subsystem within the predetermined temperature range; and

requesting a second agent from the hierarchy of agents to process the sensory data when the first agent cannot keep the temperature range within the predetermined temperature range unless the second agent redistributes the cooling fluid being delivered to one or more areas in the data center.

*See id.*

95.     This claim requires that both the first agent and the second agent be agents that operate on the same cooling fluid.  Valtrus has accused Vertiv's products of performing the claimed method because the products are configured to operate in two separate modes: free-cooling mode, in which air is cooled in a first heat exchanger coil by a liquid glycol-water solution (allegedly controlled by a "first agent"), and compressor mode, in which air is cooled in a second independent heat exchanger by a two-phase refrigerant (allegedly controlled by a "second agent").  *See, e.g.*, Ex. D, 365 Data Centers Notice Letter at 106–08 (Infringement Claim Chart for the '682 Patent, pp. 30–32).  However, each type of cooling is performed by a separate heat exchanger cooling loop within the unit using separately supplied and distinct types of cooling fluid to cool the air (glycol-water in one mode and two-phase refrigerant in the other mode, respectively).  Because the units have separate cooling circuits that operate using two different types of cooling fluid, there are no first and second agents that operate on the *same* cooling fluid.  The alleged first agent controls

flow of liquid glycol-water flowing through a first heat exchanger, whereas the alleged second agent controls the flow of two-phase refrigerant flowing through an entirely separate second heat exchanger.  The alleged second agent has no capability to redistribute the flow of the glycol-water solution controlled by the alleged first agent.

96.    None of Vertiv's products, including its CW, CWA, DS, DSE, PDX, and PCW cooling units controlled by iCOM and iCOM-S controllers, perform the steps of the claim for the additional reason that the only cooling fluid contemplated by the '682 Patent is cooled air.  The patent is strictly directed to the use of hierarchical agents to improve the flow and distribution of cooled air responsive to temperature conditions of heat generating subsystems in a data center. The accused Vertiv products have no capability to control floor vents, returns, or other devices to redistribute the cooling air within a data center.  The accused Vertiv products do not adjust the cooling air based on actions by the first and second agent in the manner required by the claim.

97.    A determination that Vertiv's products do not have a first agent "adjusting a delivery rate for a cooling fluid" based on sensed temperatures of a subsystem in a data center or a second agent to process temperature data if a first agent cannot maintain the desired subsystem temperature unless the second agent "redistributes the cooling fluid being delivered to one or more areas of the data center" does not require any information from Vertiv's customers.

## COUNT I
**(Declaratory Judgment of Non-Infringement of the '284 Patent)**

98.    Vertiv repeats and realleges paragraphs 1 through 97 hereof, as if fully set forth herein.

99.    Valtrus has asserted that it is the owner of the '284 Patent.

100.    Valtrus has alleged that features of and methods performed by Vertiv's products, including Liebert CW, CWA, DS, DSE, PDX, and PCW cooling units controlled by iCOM and/or iCOM-S control systems, infringe the '284 Patent.

101.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality regarding whether Vertiv's products, or their use, infringe any claims of the '284 Patent to warrant the issuance of a declaratory judgment of non-infringement.

102.    A judicial declaration is necessary and appropriate so that Vertiv may ascertain its rights regarding its accused products, including Liebert CW, CWA, DS, DSE, PDX, and PCW cooling units equipped with iCOM and/or iCOM-S controls, and the '284 Patent.

103.    Vertiv's accused products do not practice or embody the limitations of the claims of the '284 Patent and do not infringe that patent, such that the use thereof by Vertiv's customers does not directly infringe and Vertiv has not contributed to or induced infringement of the '284 Patent.

104.    Vertiv is entitled to a declaratory judgment that its products, including its Liebert CW, CWA, DS, DSE, PDX, and PCW cooling units equipped with iCOM and/or iCOM-S control systems, and use of the same, have not infringed and do not infringe, either directly or indirectly, literally under the doctrine of equivalents, any claim of the '284 Patent.

## <u>COUNT II</u>
### (Declaratory Judgment of Non-Infringement of the '682 Patent)

105.    Vertiv repeats and realleges paragraphs 1 through 97 hereof, as if fully set forth herein.

106.    Valtrus has asserted that it is the owner of the '682 Patent.

107.    Valtrus has alleged that features and methods performed by Vertiv's products, including Liebert CW, CWA, DS, DSE, PDX, and PCW cooling units controlled by and iCOM and/or iCOM-S control systems, infringe the '682 Patent.

108.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality regarding whether Vertiv's products, or their use, infringe any claims of the '682 Patent to warrant the issuance of a declaratory judgment of non-infringement.

109.    A judicial declaration is necessary and appropriate so that Vertiv may ascertain its rights regarding its accused products, including Liebert CW, CWA, DS, DSE, PDX, and PCW cooling units equipped with iCOM and/or iCOM-S controls, and the '682 Patent.

110.    Vertiv's accused products do not practice or embody the limitations of the claims of the '682 Patent and do not infringe that patent, such that the use thereof by Vertiv's customers does not directly infringe and Vertiv has not contributed to or induced infringement of the '682 Patent.

111.    Vertiv is entitled to a declaratory judgment that its products, including its Liebert CW, CWA, DS, DSE, PDX, and PCW cooling units equipped with iCOM and/or iCOM-S control systems, and use of the same, have not infringed and do not infringe, either directly or indirectly, literally under the doctrine of equivalents, any claim of the '682 Patent.

### <u>COUNT III</u>
**(Declaratory Judgment of Non-Infringement of the '683 Patent)**

112.    Vertiv repeats and realleges paragraphs 1 through 97 hereof, as if fully set forth herein.

113.    Valtrus has asserted that it is the owner of the '683 Patent.

114.    Valtrus has alleged that features of and methods performed by Vertiv's products, including Liebert CW, CWA, DS, DSE, PDX, and PCW cooling units controlled by iCOM and/or iCOM-S control systems, infringe the '683 Patent.

115.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality regarding whether Vertiv's products, or their use, infringe any claims of the '683 Patent to warrant the issuance of a declaratory judgment of non-infringement.

116.    A judicial declaration is necessary and appropriate so that Vertiv may ascertain its rights regarding its accused products, including Liebert CW, CWA, DS, DSE, PDX, and PCW cooling units equipped with iCOM and/or iCOM-S controls, and the '683 Patent.

117.    Vertiv's accused products do not practice or embody the limitations of the claims of the '683 Patent and do not infringe that patent, such that the use thereof by Vertiv's customers does not directly infringe and Vertiv has not contributed to or induced infringement of the '683 Patent.

118.    Vertiv is entitled to a declaratory judgment that its products, including its Liebert CW, CWA, DS, DSE, PDX, and PCW cooling units equipped with iCOM and/or iCOM-S control systems, and use of the same, have not infringed and do not infringe, either directly or indirectly, literally under the doctrine of equivalents, any claim of the '683 Patent.

## COUNT IV
### (Declaratory Judgment of Invalidity of the '284 Patent)

119.    Vertiv repeats and realleges paragraphs 1 through 97 hereof, as if fully set forth herein.

120.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality regarding the validity of the claims of the '284

Patent to warrant the issuance of a declaratory judgment of invalidity.  Accordingly, there exists

an actual and justiciable controversy between the parties regarding the validity of the'284 Patent.

121.    One or more claims of the '284 Patent are invalid for failing to satisfy one or more

requirements of the patent laws of the United States, including but not limited to 35 U.S.C. §§ 101,

102, 103 and 112.

122.    A judicial declaration is necessary and appropriate so that Vertiv may ascertain its

rights regarding the '284 Patent.

**COUNT V**
**(Declaratory Judgment of Invalidity of the '682 Patent)**

123.    Vertiv repeats and realleges paragraphs 1 through 97 hereof, as if fully set forth

herein.

124.    As a result of the acts described in the preceding paragraphs, there exists a

controversy of sufficient immediacy and reality regarding the validity of the claims of the '682

Patent to warrant the issuance of a declaratory judgment of invalidity.  Accordingly, there exists

an actual and justiciable controversy between the parties regarding the validity of the '682 Patent.

125.    One or more claims of the '682 Patent are invalid for failing to satisfy one or more

requirements of the patent laws of the United States, including but not limited to 35 U.S.C. §§ 101,

102, 103 and 112.

126.    A judicial declaration is necessary and appropriate so that Vertiv may ascertain its

rights regarding the '682 Patent.

**COUNT VI**
**(Declaratory Judgment of Invalidity of the '683 Patent)**

127.    Vertiv repeats and realleges paragraphs 1 through 97 hereof, as if fully set forth

herein.

128.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality regarding the validity of the claims of the '683 Patent to warrant the issuance of a declaratory judgment of invalidity.  Accordingly, there exists an actual and justiciable controversy between the parties regarding the validity of the '683 Patent.

129.    One or more claims of the '683 Patent are invalid for failing to satisfy one or more requirements of the patent laws of the United States, including but not limited to 35 U.S.C. §§ 101, 102, 103 and 112.

130.    A judicial declaration is necessary and appropriate so that Vertiv may ascertain its rights regarding the '683 Patent.

## **JURY DEMAND**

131.    Vertiv hereby demands a trial by jury on all issues.

## **PRAYER FOR RELIEF**

WHEREFORE, Vertiv requests this Court to enter judgment in Vertiv's favor and against Valtrus as follows:

132.    A declaration that Vertiv's products, based on its features and capabilities accused by Valtrus, do not infringe and have not infringed, and use of those Vertiv products by Vertiv's customers, does not infringe and has not infringed, under any theory of infringement (including directly or indirectly) any claim of the Patents-in-Suit, literally or under the doctrine of equivalents, in violation of 35 U.S.C. § 271;

133.    A declaration that the Patents-in-Suit are invalid and/or unenforceable;

134.    Injunctive relief restraining Valtrus and each of its officers, directors, agents, counsel, servants, employees, and all persons in active concert or participation with any of them, or successors, and enjoining them from alleging, representing, threatening, or otherwise stating that Vertiv or Vertiv's products or the activities of customers, manufacturers, users, importers, or

sellers in relation to Vertiv's products infringe any claims of the Patents-in-Suit or from instituting or initiating any action or proceeding alleging infringement of any claims of the Patents-in-Suit against Vertiv or any customers, manufacturers, users, importers, or sellers in relation to Vertiv's products;

135.    Declaring Vertiv as the prevailing party and this case as exceptional, and awarding Vertiv its reasonable attorneys' fees, pursuant to 35 U.S.C. § 285;

136.    Ordering that Valtrus pay all reasonable attorneys' fees, expenses, and costs associated with this action; and

137.    Awarding such other and further relief as this Court deems just and proper.

Dated: February 2, 2026

Respectfully Submitted,

**OF COUNSEL:**

Timothy P. Maloney
Daniel J. Schwartz
Randal S. Alexander
Allison Strong
**NIXON PEABODY LLP**
70 West Madison, Suite 5200
Chicago, Illinois 60602
312-977-4400
tmaloney@nixonpeabody.com
djschwartz@nixonpeabody.com
ralexander@nixonpeabody.com
astrong@nixonpeabody.com

*/s/ Daniel J. Schwartz w/permission*
*William E. Davis, III*
William E. Davis, III
Texas Bar No. 24047416
Ty Wilson
Texas State Bar No. 24106583
**DAVIS FIRM PC**
213 N. Fredonia Street, Suite 230
Longview, TX 75601
903-230-9090
bdavis@davisfirm.com
twilson@davisfirm.com

***Attorneys for Plaintiff Vertiv Corporation***